**582**

Ada Britt BOLES, Appellee,

v.

ALUMINUM COMPANY OF AMERICA,
Appellant.

Supreme Court of Tennessee.

Aug. 7, 1972.

Goddard & Gamble, Maryville, for appellant.

Carey E. Garrett, Knoxville, for appellee.

OPINION

DYER, Chief Justice.

The employer, Aluminum Company of America, appeals from the action of the chancellor in awarding full benefits due under our Workmen's Compensation Statutes for the death of the employee, Barry Bruce Boles.

The employee died suddenly while on the job of a heart attack and the critical issue is whether there is any evidence to support the finding of the chancellor there was a causal relationship between the work employee. was required to perform and his death.

Employee was employed as a "potman" working in what is designated as a "potroom" which is a smelting operation where ore is made into aluminum by an electrical process. This is done by the use of pots arranged in a long continuous line. The pots are about twelve feet by twenty-one feet and four feet deep. The job of each potman is to attend fifteen of these pots to see that the process of smelting continues to the end that the molten ore reaches the correct consistency and contains the correct ingredients to produce the desired results.

A potman works the fifteen pots assigned to him on a pre-determined schedule. In working a pot on schedule a potman takes a crowbar about four feet long, weighing ten to fifteen pounds, and on one end of the pot breaks the crust which has solidified on top of the molten metal, allowing the gas to escape, which allows the solidified crust to drop into the hot metal and re-melt. This takes on an average of from three to eight minutes. One witness testified eight pots were worked one hour and seven the next throughout the shift.

In addition to working the pots on schedule, a potman has to work his pots on what is described as working a pot "on a light." When, for some reason such as a lowering of the temperature in a pot, or because the mixture lacks some ingredient, the pot needs working other than on schedule a light will come on over this pot and the potman will go and work this pot. This process of working a pot "on a light" requires the breaking of the crust on both ends of the pot and stirring the metal with a long handled rake. Also, if necessary, ingredients are added. This takes on an average of five to ten minutes.

The work area is hot and a potman is required to wear protective clothing. While the men are actually working the pots the work is characterized as hard work.

On September 7, 1967, employee was working the shift from 2:00 o'clock, P.M. to 10:00 o'clock, P.M. There was no unusual event in regard to employee's work other than as the chancellor found, he had on his shift more "lights" to work than was usually the case. About 4:00 o'clock, P.M. employee complained of indigestion, but continued to work. About 7:30 o'clock, P.M., employee was found dead near a toilet on the outside of the building where he worked.

Dr. Jack S. Phelan, who the chancellor found to be the "company doctor," signed the death certificate giving the cause of death as "acute coronary thrombosis" due to "coronary atherosclerosis." Dr. Phelan did not testify in this case.

The employer insists any causal relationship between the work which employee was required to perform and his death is based upon either an inference upon an inference, or is pure speculation.

The only medical testimony in the record is by Dr. George Noringer, who testified in answer to hypothetical questions, he having never seen employee nor did he have any knowledge of employee's prior medical history.

Under a fair reading of all of Dr. Noringer's testimony, we think he testified with reasonable medical certainty that: first, if employee was a person with a normal heart and circulatory system he would not have been affected by the work he was performing, and his death was not causally related to his employment. Second, if employee had a pre-existing condition of a weakened heart, or atherosclerosis, then the work he was performing would contribute to accelerate his fatal heart attack.

Then, the point controlling this case is whether there is any evidence the employee had a pre-existing weakened heart or atherosclerosis. There was no autopsy and as we have noted, Dr. Noringer had no knowledge of employee's prior medical history. The testimony of Dr. Noringer to the effect employee likely had such pre-existing condition based upon employee's age group, height and weight, and the fact employee suffered from indigestion prior to the fatal attack was speculation, and if this be the only evidence on this issue the case would be controlled by the principle that where it is conjectural whether employee died from a cause operating within the employment, or a cause operating without the employment, there can be no award of benefits. Hagewood v. E. I. Du Pont, 206 Tenn. 239, 332 S.W.2d 660 (1959).

■ However, the chancellor had other evidence on this issue to consider. The death certificate signed by Dr. Phelan, on September 13, 1967, was filed of record in October, 1967, with the Division of Vital Statistics of the State of Tennessee. Under T.C.A. § 53–413, this certificate was prima facie evidence of the facts stated therein. While such certificate only raises a bare rebuttable presumption which becomes functus officio when met by contrary evidence, in this case there is no contrary evidence. See Milstead v. Kaylor, 186 Tenn. 642, 212 S.W.2d 610 (1948). Then, under this certificate the chancellor could find the employee died of a heart attack (coronary thrombosis) which was

due to the pre-existing condition of coronary atherosclerosis, which, with the medical testimony of Dr. Noringer, would support a finding there was a causal relation between the work employee was performing and his death.

This is a case where the chancellor has applied the "accidental result" rule; that is, the employee's normal work produced an accidental result in accelerating his death. See R. E. Butts v. Powell, Tenn., 463 S.W.2d 707 (1971).

The judgment is affirmed.

CHATTIN and McCANLESS, JJ., and JENKINS, Special Justice, concur.

CRESON, J., not participating.