IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2018 Session

## STATE OF TENNESSEE v. JEREMY LYNDEN MYRICK

**Appeal from the Circuit Court for Rhea County**
**No. 2013-CR-69     Thomas H. Graham, Judge**

_____

### No. E2017-00588-CCA-R3-CD

_____

The Defendant, Jeremy Lynden Myrick, appeals his jury convictions for voluntary manslaughter and aggravated assault, for which he received an effective sentence of five and one-half years' imprisonment.  In this direct appeal, the Defendant alleges the following errors: (1) that the trial court erred by denying his motion to suppress his statement because the stop of his vehicle was not supported by reasonable suspicion; (2) that the evidence was insufficient to support his voluntary manslaughter conviction, challenging the evidence establishing cause of death; (3) that admission of a photograph of the victim's injuries was more prejudicial than probative; and (4) that the State committed prosecutorial misconduct by referring to the amended death certificate which was testimonial in nature.  Following our review of the record and the applicable authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joshua P. Weiss (at trial and on appeal) and Jason A. Fisher (at trial), Chattanooga, Tennessee, for the appellant, Jeremy Lynden Myrick.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; J. Michael ("Mike") Taylor, District Attorney General; and James W. Pope III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On September 14, 2012, the Defendant hit eighty-three-year-old James D. Hassler ("the victim") in the head with a baseball bat, although the Defendant's motivation for

doing so was disputed. The victim died six and a half weeks later on October 31, 2012. Thereafter, a Rhea County grand jury charged the Defendant with second degree murder and aggravated assault by causing serious bodily injury. See Tenn. Code Ann. §§ 39-13-102(a), -210.

Prior to trial, the Defendant filed a motion to suppress the baseball bat found in his vehicle and the subsequent statement he gave to the police. A hearing on the motion was held on February 11, 2015.

## A. *Suppression Hearing*

Detective Chris Hall with the Rhea County Sheriff's Department testified that he responded to the September 14, 2012 call from the victim's home located on Rhea County Highway 27. Upon Detective Hall's arrival, about thirty or forty minutes after the call was placed, Detective Hall spoke with the victim's next-door neighbor, Beecher Brewer, who said that he had seen the events leading to the victim's injury. Mr. Brewer informed Detective Hall that he saw a woman "in a long black dress coming down the highway chasing a dog" and that the victim was near the victim's front porch when the woman approached him. Mr. Brewer said that he "could hear them talking, yelling, something[,]" before the woman returned to the passenger's side of a small, red pick-up truck that had stopped across the four-lane divided highway. According to Mr. Brewer, the truck was "two-tone[d]," meaning that the front was shiny and the back appeared to be "primered."

Mr. Brewer said that, once the female was back inside the vehicle, the "truck went down the highway south, went through a cut through, c[a]me back up, [and] pulled in the driveway where [the victim] was" located. According to Mr. Brewer, an approximately thirty-year-old Caucasian male then exited from the truck's driver's side and approached the victim and hit him in the head "with a stick" or "piece of wood[,]" and the victim "fell to the ground." Mr. Brewer further stated that the man returned to the vehicle, and they drove away traveling north on the highway. At that time, Mr. Brewer did not mention any children inside the vehicle to Detective Hall.

Detective Hall opined that Mr. Brewer was approximately "[eighty] something yards" away when this incident occurred. Detective Hall also said that his conversation with Mr. Brewer lasted about five minutes because he "want[ed] to get on to try to find the vehicle." Detective Hall confirmed that Mr. Brewer did not mention a baseball bat but described a wooden object, that Mr. Brewer described one single blow to the victim's head, and that Mr. Brewer did not say anything about seeing the victim grab the female.

Detective Hall further relayed that Sergeant David King had talked with Mr. Brewer even before he did and that an ambulance had already taken the victim to the

hospital prior to Detective Hall's arrival. According to Detective Hall, he and "the others there on the scene [were] concerned [with] whether [the victim] was going to live or not[.]"

After receiving the information from Mr. Brewer, Detective Hall, Officer Dean Cranfield, and Sergeant King left the victim's home driving north and looking for the suspect truck. Detective Hall testified that, when he approached the county line between Rhea and Roane Counties, he passed a red truck matching Mr. Brewer's description that was headed south back into Rhea County. Detective Hall said that he radioed this information to Sergeant King who was patrolling "the side roads" behind him and told Sergeant King to stop the truck. According to Detective Hall, Sergeant King, a short time later, radioed back to Detective Hall that he had stopped the truck and indicated that the truck's occupants matched Mr. Brewer's description.

When Detective Hall arrived at the location of the traffic stop "within three to four minutes," Detective Hall "walked up to the passenger's side of the vehicle" and asked Sergeant King "to get the driver, the male, out of the vehicle, and bring him back." Detective Hall wanted the two individuals separated to "[s]ee if they were both telling the same story." Detective Hall went to speak with the truck's passenger, one Stephanie Heflin, and he saw two small children in the backseat crying. Detective Hall testified that Ms. Heflin, who was wearing a long black dress, confirmed that she and the Defendant had been involved in the incident at the victim's house that occurred earlier that day. She also acknowledged that the Defendant had struck the victim in the head with a baseball bat, averring that the Defendant did so because the "old man" was trying to rape her. Detective Hall opined that Ms. Heflin, the Defendant, and the truck matched the description given by Mr. Brewer.

Detective Hall said that he was not originally looking for a baseball bat because the "initial report was that it was a stick." However, as Detective Hall was speaking with Ms. Heflin and she mentioned a bat, he observed a baseball bat "in plain view" in the backseat of the truck behind the driver's seat. According to Detective Hall, he saw the bat through the truck's open window while he was speaking with Ms. Heflin, who remained seated in the truck. A photograph of the bat inside the truck was introduced as an exhibit.

When Detective Hall saw the bat, he believed that they needed to take the Defendant and Ms. Heflin "to the office . . . to get their statements of exactly what happened." Detective Hall did not recall speaking with the Defendant about the events while on the scene of the stop. According to Detective Hall, the Defendant agreed to go to the sheriff's department to give a statement, and the Defendant was driven by Sergeant King in a patrol car. Detective Hall said that it was the department's policy not "to transport anybody without handcuffs," although he could not recall if the Defendant was

ever placed in handcuffs. Officer Cranfield separately drove Ms. Heflin and the children to the station, and the truck was towed. According to Detective Hall, they arrived back at the station approximately one hour after stopping the Defendant, which included thirty to forty-minutes of travel time. Detective Hall's vehicle did not have a video camera, and there was no recording of the traffic stop.

About thirty minutes after arriving at the sheriff's department, Detective Hall spoke with the Defendant alone in his office, and another officer spoke with Ms. Heflin. If the Defendant was in handcuffs initially, Detective Hall believed that he took them off before speaking with the Defendant. Detective Hall interviewed the Defendant after the Defendant was read his Miranda warnings and signed a waiver. According to Detective Hall, at this time, the Defendant was no longer free to leave. During the interview, the Defendant admitted to hitting the victim in the head with a baseball bat.

According to Detective Hall, the Defendant did not appear to be under the influence of any substances during the interview; the Defendant did not appear to have any comprehension problems; the Defendant was not made any promises or threatened; the Defendant did not request an attorney; the Defendant agreed to give a statement; and the Defendant was "cooperative." Detective Hall said that the Defendant first gave an oral statement, which Detective Hall wrote down and the Defendant signed, dated, and initialed. According to Detective Hall, it was his "normal policy" to either have the individual read the statement or for him to "read it back over" verbatim to the individual before it was signed. Detective Hall clarified this process, "Most of the time I read them back to them and ask them if they want to read it. If they do then I give it to [them]." Detective Hall confirmed that the interview was not recorded, and he opined that the entire interview process did not take "over an hour." After the interview, the Defendant was arrested.

The Defendant also testified at the suppression hearing. He stated that, upon being pulled over on September 14, 2012, he was instructed to get out of his vehicle, and the officer started asking him questions about what he had been doing and where he was going. According to the Defendant, he told the officer about "the events that had just taken place," and he was immediately placed in handcuffs, put in the back of a patrol car, and told that he was going to be taken to the police station and that he would "be there for a while." The Defendant stated that, when the officer approached the truck's driver's side window, the officer did not ask for the Defendant's driver's license. At no point during this interaction with the officer was the Defendant read his Miranda rights; nonetheless, the Defendant said that he did not believe that he was free to leave. The Defendant further stated that he was already in the patrol car when the detective arrived and that he did not speak with the detective at all on the scene.

The Defendant averred that, during the car ride to the station, the officer made "some threats" towards him, "telling [him] what he would have done if [he] would have done that to his daddy." The Defendant confirmed that he was taken to an office in the police station upon his arrival; however, according to the Defendant, it was "quite some time" before the detective came in and removed his handcuffs. The Defendant acknowledged that he was given "some forms" and was "sure [he] signed things" because he "was just in complete shock about the events that had happened in the day." The Defendant reasoned, "I probably put my signature on things that I hadn't read over, just trying to get out of there, just under the premise that I may be able to leave[.]" The Defendant conceded that the detective reviewed his Miranda rights with him.

The Defendant testified that he felt "compelled to give a statement" because he "wanted to clear up . . . the events that took place" and was "hoping that it would help [his] situation[.]" According to the Defendant, the detective did not threaten him to make a statement; however, the detective did say to "[him] in a firm voice [he] was going to give a statement[.]" The Defendant agreed that the detective read the statement back to him, but he averred that he did not have an opportunity to read or review the statement before he signed it. Furthermore, the Defendant said that it was the detective and not him who initialed the statement. The Defendant opined that the statement, as transcribed by the detective, was not an accurate representation of what the Defendant had told him. He clarified that it was a "[n]ot a verbatim" recitation, meaning that only parts of it were true.

The Defendant said that a person "standing at the passenger['s side] window could" possibly have seen the "bat in the back floorboard of" the truck but his "windows [were] tinted very darkly[.]" Moreover, the Defendant noted that the children were in the truck when the officer approached. He stated that it was unlikely that any of the officers saw the baseball bat inside the truck even if the window was open. Regardless, the Defendant claimed that the photograph did not show the officer's point of view if he was at the passenger's side window speaking with Ms. Heflin. According to the Defendant, the door had been opened in the photograph.

After the trial court heard arguments on the motion, the motion was denied. The trial court concluded that the traffic stop was supported by reasonable suspicion, that the baseball bat was observed in plain view, and that the Defendant's statement to Detective Hall at the police station was voluntarily given after proper Miranda warnings. The Defendant proceeded to a trial by jury held in February 2016.

B. *Trial*

1. <u>State's Proof</u>.  At trial, the victim's seventy-seven-year-old brother, Paul Hassler,[1] testified about the victim's accomplishments and achievements, including thirty-four years' service in the United States Army that spanned both the Korean and Vietnam wars, during which time the victim attained the rank of Master Sergeant, and for which the victim earned numerous medals.  The victim also fathered four children.  According to Paul, when the victim left the Army, he performed "contract work for railroads, ballast cleaning and rail grinding."  After the victim retired, he came to live with Paul on Paul's property on Rhea County Highway, and he had lived there for approximately seven or eight years prior to September 2012.  Paul described that the victim lived in "a little frame house" on the front of the property near the highway, that he lived in a house "[p]robably 1500, 1800 feet" uphill, and that Mr. Beecher Brewer was their next-door neighbor.  In addition, Paul reported that, in September 2012, the eighty-three-year-old victim was roughly five feet, nine inches tal1, weighed approximately 165 pounds, and suffered from "some memory problems."  Paul confirmed that the victim had a caregiver, Ms. Ernestine Ferrell.

Paul further maintained that, prior to the victim's head injury, the victim could feed himself and ate "like a horse" and that the victim would often walk up the "steep incline" to Paul's house, sometimes even running.  Paul portrayed the victim as an "[e]asy going" individual.  When asked about the victim's daily routine, Paul described that, after the victim ate breakfast, he would "go outside and walk around with his old dog and pick up sticks and trash and stuff out of the yard," and during the summertime, the victim would work "in the garden."  Paul said that he was able to converse normally with the victim.  The victim did not have a car and rarely left Paul's property.  According to Paul, other family members would occasionally stop by to visit with the victim, and at times, someone would take the victim "over to the creek fishing" or to buy groceries or to the liquor store for a bottle of Canadian Mist whisky.  Paul said that the bottle of whisky would be replaced "once or twice a month maybe."

Ms. Ferrell testified that she started caring for the victim after he had gallbladder surgery, that she cared for the victim for three years prior to his death, and that she arrived at the victim's house around 7:00 a.m. every day and left at approximately 3:30 p.m. when J.C. Hassler, another brother of the victim's, arrived for dinner.  According to Ms. Ferrell, J.C. went home after dinner, and the victim was then there by himself.  Ms. Ferrell said that she provided the victim with companionship and performed such duties as meal preparation, laundry, and housekeeping.

Ms. Ferrell also described the victim's "normal day":

---

[1] Because several witnesses share the same surname, we will refer to some witnesses by their first names to avoid confusion.  No disrespect is intended.

[H]e would get out of bed in the morning. Before he came out of the bedroom he'd get on the floor and do pushups with one hand for at least [fifty] times. Then he'd eat his breakfast. Well, sometimes he'd eat his breakfast before he took a shower or shaved. That was his normal routine. Then he would go outside. He didn't like being inside. He liked the outdoors. He'd be outside picking up cans or old twigs and stuff out in the yard, pulling the weeds out of the garden, just keeping himself active[.]

She expressed that the victim "was a very proud independent man who had taken good care of himself." According to Ms. Ferrell, the victim was only taking two medications prior to his head injury, "an iron pill and a baby aspirin," and only visited the doctor "something like every three or six months . . . for a regular checkup." She stated that she was a retired "clinical nurse's assistant and scrub tech" and that she would have known if the victim had been diagnosed with dementia, diabetes, or "a disease that made it hard for him to swallow[.]"

According to Ms. Ferrell, the victim always "was very nice and friendly" and treated her with respect. However, she never worried that the victim "might be too friendly, so friendly as to come across as inappropriate[.]" Moreover, Ms. Ferrell said that she never observed the victim have any "problems remembering things," go through any period of depression, or "act untoward towards anybody[.]"

Ms. Ferrell confirmed that the victim frequently walked uphill to visit Paul at Paul's house. While Ms. Ferrell sometimes would accompany the victim, she would have to stop along the walk to rest, and the victim would "keep going." Ms. Ferrell further stated that the victim would sometimes stop by to see his neighbor, Mr. Brewer, and "they would exchange vegetables and stuff." Ms. Ferrell reported that, before his being hit on the head, the victim "had a good appetite" and he did not have any problems swallowing or communicating. In addition, Ms. Ferrell testified that the victim enjoyed the occasional glass of whisky with his brother J.C., but she did not see any evidence of the victim's being a habitual drinker. Ms. Ferrell stated that the victim did not have anything to drink on the morning of September 14, 2012,[2] prior to these events happening between 9:00 and 11:00 a.m.

At trial, Mr. Brewer provided testimony similar to his suppression hearing testimony. In addition, Mr. Brewer said that he spoke with the victim almost every day when the victim came over to partake in "a chew of tobacco." Mr. Brewer testified that he had never seen the victim "drunk out there[.]" Mr. Brewer acknowledged that the victim had dementia and trouble remembering things, although Mr. Brewer believed that the victim was "in good physical shape" and health.

---

[2] Ms. Ferrell mistakenly testified that these events occurred on September 11, 2012.

Mr. Brewer again recounted the events that occurred that day. According to Mr. Brewer, he was "out [in] front" of his garage and workshop "building some birdhouses and birdfeeders" on the morning of September 14, 2012, when he saw Ms. Heflin chasing a dog. Mr. Brewer said that Ms. Heflin yelled that someone needed to get the dog out of the road before it got hit. Although Mr. Brewer did not see the dog that day, he had previously seen a "little stray dog" that often roamed that stretch of the highway. Mr. Brewer relayed that the victim was walking near the victim's carport with the victim's dog, "Woodrow," when Ms. Heflin started up the victim's driveway. The victim met Ms. Heflin in the driveway, and the two spoke. Mr. Brewer returned to his woodworking and could not hear their conversation. Mr. Brewer testified that, from his vantage point about 200 feet away, nothing was obstructing his view and he never witnessed a struggle between the victim and Ms. Heflin. Mr. Brewer did not believe "for a minute" that the victim made any inappropriate comments to Ms. Heflin. According to Mr. Brewer, the victim had never "said anything disrespectful or out of the way" to him.

Mr. Brewer heard Ms. Heflin's yelling something, and the man in the truck, who Mr. Brewer identified at trial as the Defendant, yell something back to her. Mr. Brewer believed that the Defendant was telling Ms. Heflin to return to the truck because she quickly did so. Mr. Brewer then saw the truck leave heading south. Shortly thereafter, about "[t]wo to three minutes" later, Mr. Brewer saw that the truck had returned, and he then heard the Defendant yell, "You son-of-a-b---h," before hearing a "smack." Mr. Brewer likened the smacking sound to "throwing up a big potato and hitting it with a ball bat." According to Mr. Brewer, upon hearing the noise, he looked up, and the victim was on the ground. Mr. Brewer did not see Ms. Heflin get out of the truck during this return visit.

Mr. Brewer however testified at trial that he did not see the Defendant strike the victim but only witnessed the commotion that followed. He did not recall telling Detective Hall that he saw the Defendant hit the victim "in the head with a big stick." Mr. Brewer confirmed that his statement, as transcribed by Detective Hall, provided that he made such a disclosure.

According to Mr. Brewer, after the truck "speed off[,]" he immediately went to the victim's aid and found him "on his hands and knees" with "a big gash over his left eye" and his skin was torn "and peeled back[.]" Mr. Brewer said that "blood was squirting" from the injury. Mr. Brewer tried to stop the bleeding by holding his bandana over the wound. Ms. Ferrell "came out just shortly after" Mr. Brewer arrived, and she described that the victim was on his knees when she arrived and that the victim had "blood dripping from his face and [his] eye looked like it was out of place." Ms. Ferrell also expressed, "I saw all this blood up here and his eye looked like it was coming out. The left eye looked

like it was coming out of the socket." According to Ms. Ferrell, there was blood "all over" the victim's dog, too.

Mr. Brewer and Ms. Ferrell helped the victim, who was unable to get up on his own, to the victim's carport and sat him down. Ms. Ferrell went inside and called 9-1-1, and thereafter emergency personnel arrived on the scene. The police arrived first, and Mr. Brewer told them what had happened, including a description of the Defendant, Ms. Heflin, and the pick-up truck. Mr. Brewer estimated that it took about twenty to twenty-five minutes for the ambulance to arrive. Ms. Ferrell said that, while they were waiting, she took "cold compress[] washcloths" to Mr. Brewer to put over the victim's eye, which "was filling up full of blood." The victim was immediately transported to the hospital after ambulance arrived.

Detective Chris Hall provided testimony at trial similar to that which he gave at the suppression hearing. Detective Hall stated that the "initial call was dispatched at 10:40 a.m.," and he arrived at the victim's residence around 11:45 to 11:50 a.m. Detective Hall relayed the details of his conversation with Mr. Brewer that day, including the description Mr. Brewer gave to him of the Defendant, Ms. Heflin, and their pick-up truck. Detective Hall also told the jury about the subsequent pursuit and traffic stop of the Defendant and Ms. Heflin. According to Detective Hall, he radioed to Sergeant King at 12:07 p.m. to stop the Defendant, and Sergeant King effectuated that order at 12:09 p.m.

Detective Hall also detailed the circumstances of the Defendant's statement at the sheriff's department. The Defendant told Detective Hall that Ms. Heflin approached the victim about a loose dog, that the victim grabbed Ms. Heflin's arm while they were talking, that Ms. Heflin "jerked back" from the victim yelling that the victim was trying to rape her, that Ms. Heflin ran and got inside the truck, and that he got an aluminum bat from behind the driver's seat and hit the "old man in the head one time." The Defendant said that they then drove away looking for a state park where Ms. Heflin's children could play; however, once there, they "did not find much to do," so they decided to go home.

Detective Hall testified that his office was not equipped with audio or video recording technology. Detective Hall also said that there was only one 9-1-1 call and that the caller's name was identified to him as one J.C. Hassler.

Detective Hall also measured and determined that Mr. Brewer was approximately eighty-seven yards away from the incident. The victim had already been buried by the time Detective Hall became aware of his death. Detective Hall stated that he did not have the authority to order an autopsy and opined that it was "[c]ase dependent" whether an autopsy was helpful.

Paul Hassler testified that, after the victim's head injury, he visited him "about every day" at the hospital. Paul said that the victim's memory problems "had gotten worse," explaining that "he could respond to you, but he didn't really know a whole lot of people." Paul maintained that he was not able to have the same conversations with the victim and that the victim was not "the same person" as before. Moreover, the victim was unable to feed himself; he ultimately required a feeding tube for nutrition; and he "was in bed most of the time" after the feeding tube was placed. Paul confirmed that, after the victim was sent to the nursing home, the victim had to be readmitted to the hospital on October 21, 2012, because of "kidney failure[.]"

Ms. Ferrell testified that she visited the victim once he was moved to the rehabilitation center. She said that she stayed with him for eight hours "every day" until his death. According to Ms. Ferrell, the victim never spoke to her during this time; he was unable to perform basic tasks, including feeding himself; and he was bedridden. Ms. Ferrell opined that the victim was not "the same person after" being hit in the head.

Dr. Vincente Mejia, a trauma surgeon at Erlanger Hospital in Chattanooga, examined the victim when he arrived at the hospital on September 14, 2012. Dr. Mejia determined that the victim had "multiple injuries to his head and face," including "a laceration of the forehead," "fractures of the bone of his forehead" on his left sinus cavity, "fractures of the facial bones . . . especially on the left side" of his head, and injuries to the soft tissue of his forehead. The skull fracture led to the victim's having "pooling of the blood around the eyes" or "raccoon eyes." The victim also suffered from "bleeding on the brain": "So he had a hematoma and he had subarachnoid hemorrhage, which is pooling of blood in the base of the brain, and also bleeding to the ventricles . . . in the brain." Dr. Mejia determined that the victim "had traumatic brain injury as a result of trauma." He believed that the victim's injuries were "critical," particularly given the victim's advanced age, and his prognosis for the victim was "guarded." Dr. Mejia said that, although he did speak with the victim, the victim "was still confused." According to Dr. Mejia, a healthy patient with a head injury would face a recovery period of "at least six to nine months."

Dr. Mejia testified that he was unable to determine if the victim's injuries resulted from a single blow or multiple blows, although "[i]t looked like one." According to Dr. Mejia, the victim's injuries were consistent with being hit in the head with a baseball bat, and the injuries were the result of "a significant amount of force."

Dr. Mejia relayed that the victim had to have several surgeries while in the hospital. A plastic surgeon had to operate on the victim's face. In addition, according to Dr. Mejia, the victim developed a condition called "oropharyngeal dysphagia," meaning that he was having difficulty swallowing. Dr. Mejia said that the victim's swallowing mechanism remained altered, which caused significant aspiration of food into the lungs,

thereby creating a risk of pneumonia and sepsis. Therefore, Dr. Mejia performed surgery to insert a feeding tube. According to Dr. Mejia, the victim did not have "any history of aspiration before the accident," and he was not malnourished upon admission to the hospital. Dr. Mejia confirmed that his "post-op" notes indicated that the victim had Barrett's Esophagus, which is a "changing in the lining of the mucosae of the esophagus" that may cause "chronic reflux." Dr. Mejia said that Barrett's Esophagus could eventually lead to cancer. Furthermore, Dr. Mejia stated that, while in the hospital, the victim was seen by a cardiologist and treated for "an irregular heartbeat." Dr. Mejia did not have any medical history indicating that the victim had a heart condition prior to September 14, 2012. However, Dr. Mejia maintained that the victim did not have any other diseases, such as cancer, that concerned him about the victim's health. After two weeks in the hospital, Dr. Mejia sent the victim to a rehabilitation facility.

In addition, Dr. Mejia said that he had filled out "many" death certificates. He testified that "an autopsy is requested if the cause of death is not obvious." Also, Dr. Mejia described that there is "usually an immediate cause of death and secondary causes." When Dr. Mejia was asked if "[a]n autopsy in this case would have shown whether or not the head injury had anything to do with the pneumonia and aspiration," he opined, "No, I don't think so, but that's not my area of expertise, but I can tell you that probably not, because . . . [y]ou can aspirate for many reasons and you can have pneumonia."

Once at the rehabilitation center, the victim was treated by internal medicine Dr. Hak Seo. Initially, Dr. Seo hoped to rehabilitate the victim so he could return home and resume his relatively independent lifestyle. However, the victim was unable to communicate with Dr. Seo, not being able to talk in full sentences, and the victim remained "very confused" and only responded to visitors by smiling or crying. The victim also continued to require a feeding tube, was confined to a bed or wheelchair, and needed a Foley catheter. Dr. Seo said that the victim "went down quick[ly]," and he eventually resigned himself to making the victim as comfortable as possible.

Dr. Seo confirmed that the victim ultimately died on October 31, 2012, from malnutrition and dehydration, "secondary to aspiration pneumonia[,] secondary to head trauma." Dr. Seo explained aspiration pneumonia:

> [A]fter any kind of head trauma, or someone who suffers a real bad injury, . . . they kind of lose their function of swallowing, so that they, you know— and a lot of times they can, they can get fed, and if they're not really watching that food or liquid can go into their windpipe and that'll settle in their lungs and they can develop an infection.

Dr. Seo said that the head trauma was an "obvious" contributor to the victim's death. In addition, Dr. Seo was not aware of the victim's having any swallowing problems or history of pneumonia prior to his head injury. Moreover, Dr. Seo said that the victim did not suffer from cancer, heart disease, or diabetes. Dr. Seo confirmed that the victim took "baby aspirin once a day." Dr. Seo opined to a reasonable degree of medical certainty that the victim's condition never improved prior to his death.

Dr. Seo prepared the victim's death certificate, certifying therein that the victim died from aspiration pneumonia and classifying the victim's death as resulting from natural causes. Dr. Seo affirmed that he did not list the head trauma in the death certificate, that he did not report the death to the county medical examiner or the sheriff's department, and that no autopsy was performed. When asked if he should have reported the victim's death, Dr. Seo replied, "I don't think so. . . . Because we decided to go on hospice care, so . . . the brother just wanted comfort measures." Dr. Seo also explained that the victim's brother did not request an autopsy, but Dr. Seo agreed that an autopsy could have been helpful.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson Counties and the Chief Forensic Pathologist for East Tennessee Regional Forensic Center, received a request from the Rhea County Medical Examiner, Dr. Beth Casady, to review the victim's case. Dr. Mileusnic-Polchan reviewed the victim's medical records, and she described the initial injuries. She maintained that it was "a miracle" that the victim survived the original head trauma, believing that the victim's initial survival was likely due to his good health at the time of the injury. Dr. Mileusnic-Polchan opined that, based upon her review of the victim's medical history and her knowledge of the victim's "state of health" prior to the assault, "all the complications . . . recorded in the victim's medical records stem or come from the blunt force head trauma." Dr. Mileusnic-Polchan continued, "As a matter of fact, the complications that are described such as inability to process what he's being told, inability to utter or say the words, communicate, and the problems swallowing are pretty typical for . . . direct trauma to the brain in the left hemisphere." She conveyed that the immediate cause of death in this case, aspiration pneumonia, was a complication from the original head trauma.

Dr. Mileusnic-Polchan opined to a reasonable degree of medical certainty that the victim's cause of death was "sequela result blunt force head trauma due to assault," and she maintained that was how she would have documented it in the death certificate. Dr. Mileusnic-Polchan confirmed that an autopsy, which included a toxicology report, could have provided "additional helpful information that strengthen[ed] the case." Dr. Mileusnic-Polchan maintained that the immediate cause of death can provide an incomplete picture of "what really happened" and believed that many physicians were not

-12-

properly "trained in [the] art of completing death certificate[s]" or "even reporting the cases to the medical examiner." Dr. Mileusnic-Polchan said that she would have classified the victim's death as a homicide on the death certificate rather than death from natural causes as Dr. Seo did.

According to Dr. Mileusnic-Polchan, Dr. Seo "messed up" by not recording that blunt force head trauma was the ultimate cause of the victim's death, and the reason that there was no autopsy in this case was because the victim's death was not reported. Dr. Mileusnic-Polchan said that, in a case like this one that "f[e]ll through the cracks," "there [were] a couple of options, . . . either review the medical records or . . . perform exhumation." She noted that a county's medical examiner could amend a death certificate "from the investigation that they do." However, Dr. Mileusnic-Polchan clarified that "exhumations are actually very expensive" and "very time consuming" and averred that "the results are not necessarily always the best."

Dr. Mileusnic-Polchan confirmed that she only reviewed the victim's medical records about a week prior to trial, and she did not believe that Dr. Casady ever examined the victim's body. Dr. Mileusnic-Polchan explained that, when she spoke with Dr. Frank King, the Defendant's expert, she had not yet reviewed the victim's medical records. Moreover, upon reviewing the medical records, Dr. Mileusnic-Polchan did not find it necessary to contact Dr. Seo to discuss this matter before making her conclusions.

In addition, Dr. Mileusnic-Polchan said that she did not "see anything in the medical records that would indicate . . . that [the victim] was poisoned by wrong administration of drugs." She also said that Barrett's Esophagus "would not necessarily cause regurgitation and aspiration" as seen in this case. She confirmed that the victim, while being cared for, suffered from an infection around his feeding tube.

2. Defense Proof. Dr. Frank King, a retired forensic pathologist, who spent most of his career as the Hamilton County Medical Examiner, testified on the Defendant's behalf. Dr. King also reviewed the victim's medical records, which he described as "confusing." When asked if he was "able to glean any type of medical history or illnesses" that the victim had, Dr. King replied,

> Well, when he showed up at the Rhea County emergency room, . . . they wrote in their chart then that he had, of course, the head injury. His blood pressure was elevated at that time. He had, they said severe dementia, and they said was mumbling speech. He had a cough. He had an increased heart rate, and he had a past medical history of having had his gallbladder removed, his blood sugar was elevated, and the nursing home admission notes added that he had atrial fibrillation, which is a . . . type of abnormal rhythm in the top part of the heart, and he also had hypertension.

-13-

Dr. King also determined from the x-rays that the victim had calcium deposits in "the aortic arch," signifying "advanced atherosclerotic disease" or "hardening of the arteries." In addition, Dr. King believed that the victim had "diabetes type two." Regarding the assertions that the victim was in good health prior to this incident, Dr. King said, "So you can be healthy and strong in appearance outside and you can still have some medical problems that are ultimately going to get you on the inside of your body, so that can be a little misleading."

Dr. King said that he could not recall ever testifying in a murder trial where an autopsy had not been conducted, despite both Detective Hall's and Dr. Mileusnic-Polchan's testimony that they had done so. According to Dr. King, an autopsy needed to be conducted "to prove [the] cause of death[] and to prove the absence of other things" and also to collect medical evidence. Dr. King also noted his disagreement with Dr. Mileusnic-Polchan's conclusion regarding the cause of the victim's death. Dr. King's disagreement with Dr. Mileusnic-Polchan's opinion resulted solely from the lack of an autopsy and the inability to exclude other causes.

Dr. King claimed that he had spoken with both Drs. Casady and Mileusnic-Polchan about two weeks prior to trial. He said that Dr. Casady told him that she did not issue an autopsy report because she did not see the body and did not investigate. Dr. King said that Dr. Mileusnic-Polchan told him she had no opinion regarding the victim's cause of death and that "she wouldn't feel comfortable saying what the cause of death was" without an autopsy. Dr. King maintained that the performance of toxicology tests was also an important function of an autopsy to establish that the victim did not have "inappropriate drug levels" in his system at the time of death. Dr. King affirmed that his "first thought" would be that complications from the head injury caused the victim's death, but he averred that "there's still some unknown things" he would want to clarify. Dr. King surmised, "I would have a hard time coming to the conclusion that the head injury alone caused the death with any level of confidence."

On cross-examination, Dr. King admitted that, while he was the medical examiner, he "did not autopsy a lot of cases," although he would still investigate the circumstances of the death. Dr. King agreed that an autopsy was more difficult on a body that had already been embalmed. Dr. King acknowledged that, once a body was buried, the only two avenues to determine cause of death were to review the medical records or have the body exhumed for an autopsy.

Dr. King also stated that, if Dr. Seo believed that blunt force trauma to the head was the victim's cause of death, then Dr. Seo should have so noted on the death certificate. Dr. King said that Dr. Seo "disagree[d] with himself." Dr. King further noted his disagreement with the amended death certificate prepared by Dr. Casady, wherein she classified the victim's death as a homicide. Dr. King described the process for filing an

amended death certificate. However, Dr. King agreed that, regardless of what was noted on the death certificates, the facts of the case remained unchanged.

Dr. King acknowledged that, "but for [the victim's] being struck in the head with a bat, he would not have been in the hospital with a feeding tube," and that being bedridden can lead to pneumonia and aspiration. Dr. King also admitted that the victim "would have had some permanent decrease in brain function" from the head injury.

Ms. Heflin testified that she was thirty years old, that she had moved to Tennessee with her two young children and the Defendant to escape a previous abusive relationship, and that she had only lived in the area two or three days prior to this incident. On September 14, 2012, they "loaded up the kids and picnic snacks and sports equipment and everything" for a day at the park, and they set off. Ms. Heflin relayed that she had an affinity for animals and wanted to rescue the dog on the highway. According to Ms. Heflin, when she approached the victim to ask him about the dog, the victim told her that she looked "too decent to be dressed so indecent," and he attempted to grab her chest. Ms. Heflin said that she took a step back and that the victim missed her chest, instead aggressively grabbing her by the arm and hair. Ms. Heflin alleged that the victim said to her that she looked like a "whore" and that he was going to take her inside and treat her like one. Ms. Heflin described that she was "wearing [her] favorite black skirt" that came down to her knees and her "black tank top with gold accents on it that matched it."

Ms. Heflin claimed that she was unable to break free from the victim's grasp and yelled out to the Defendant that the victim was trying to rape her. According to Ms. Heflin, when the Defendant pulled in the driveway and came to her rescue, she was in tears, and the Defendant, with the baseball bat in hand, told the victim to release her. However, the victim failed to comply, so the Defendant freed her from his grip. Ms. Heflin claimed at trial that she never saw the Defendant hit the victim with the baseball bat because her main concern was returning to the truck and attempting to console her frightened children. In addition, Ms. Heflin maintained that the Defendant had never before been involved in a fight and that she had no reason for wanting the Defendant to beat up the victim.

As they pulled away from the victim's home, Ms. Heflin saw the victim's kneeling down on the ground "with his hand on his head." He appeared "fine." They proceeded to continue to look for a state park for the children to play, but once at the park, they decided to go home because they were in no condition to play games. They drove back towards the Defendant's parent's house where they were living.

Ms. Heflin testified that Detective Hall was aggressive when he came to the passenger's side window and that he ordered her to "get out of the f--king truck or [he was] going to show [her] what the f--k [she] did wrong." She did not recall Detective

-15-

Hall's asking her about the incident at the victim's home. Ms. Heflin said that she was then placed in the back of a patrol car, along with her two boys, and they were driven to the police station. She asserted that she asked for her heart and anxiety medication during the ride, but her request was denied.

Ms. Heflin said that she was not allowed to see her children once at the station until she gave a written statement. She said that her children were kept from her for four hours. According to Ms. Heflin, although she told an officer what had happened at the victim's house, and the officer drafted her statement for her, it did not accurately reflect what she told him. Ms. Heflin testified that she informed the officer that she was having trouble with her vision and breathing and was unable to think clearly during the interview. Ms. Heflin further claimed that the officer did not read her statement back to her and that she signed the statement without reviewing it. She also wanted to prosecute the victim for sexual assault, and she unsuccessfully tried to "press charges" that day at the station.

The thirty-two-year-old Defendant also testified, relating many of the same details as he did at the motion to suppress hearing and giving a similar recount as Ms. Heflin's. The Defendant claimed that he was "laid back" and not a violent person. He averred that he was not a jealous individual, had never been involved in a fight, and had not been convicted of any crime, excluding speeding tickets. He claimed that Ms. Heflin was "the love of [his] life."

The Defendant claimed that they headed out on "an adventure" that day looking for Fall Creek Falls State Park, but they were unfamiliar with the area. The Defendant said that, while Ms. Heflin was trying to rescue the loose dog, the victim grabbed her, and Ms. Heflin was screaming for help. According to the Defendant, he turned around in a "cut-through" and made his way to the victim's driveway. Baseball bat in hand, the Defendant approached the victim who was "trying to drag" Ms. Heflin at this point, and Ms. Heflin was screaming that the victim was trying to rape her. He said to the victim, "Get the f--k off her." When the victim did not immediately release Ms. Heflin, the Defendant "just swung to get him off of her" and ran back to the truck. The Defendant claimed that he did not aim, that it was "one wild swing," and that he had "no idea" of the amount of force he used, although the hit "was probably loud."

The Defendant denied that Ms. Heflin was able to break free from the victim's grasp and return to the truck. He insisted that he would have avoided hitting the victim if at all possible. The Defendant admitted that they did not call the police after the incident. However, he claimed that making such a call "was definitely not outside of . . . [his] thought patterns," but he "was more concerned with consoling the kids" and Ms. Heflin. In addition, the Defendant said that the victim did not "immediately drop to the ground"

after being hit and that he did not see any blood squirting out of the victim's wound. He said that, upon reflection, he "most likely" would have behaved the same way.

The Defendant acknowledged that he had the opportunity to read the written statement he gave at the police station but claimed that he "was in such a state of shock" and that he "was in no condition to comprehend anything." The Defendant also claimed that his statement to Detective Hall was incorrect, although he conceded that Detective Hall did not fabricate the details in the statement. The Defendant maintained that Detective Hall "just switched the timeline around." The Defendant agreed that, if his statement as written by Detective Hall was accurate, then he "wouldn't have had to defend anybody." He denied collaborating with Ms. Heflin to prepare consistent accounts of the incident.

3. Rebuttal Proof. The State then called retired Rhea County Sheriff's Department Detective Mike Owenby, the officer who interviewed Ms. Heflin. Ms. Heflin's statement reflected that the interview began at approximately 1:05 p.m. and lasted only five minutes. Detective Owenby testified that there was "no way" Ms. Heflin had been at the police station for four hours before he interviewed her. Detective Owenby maintained that he wrote down "exactly what" Ms. Heflin told him and that he read it back to her for her approval or she read it to herself before she signed and initialed it. According to Detective Owenby, Ms. Heflin did not wish to make any changes to the statement. Ms. Heflin did not appear to be under the influence at the time she gave her statement, in Detective Owenby's opinion. Detective Owenby estimated that the whole process took approximately thirty minutes, and then an officer took Ms. Heflin and her children home. Detective Owenby confirmed that the interview was not recorded and averred that it was not their usual practice to record statements.

Detective Owenby relayed that Ms. Heflin told him that they were trying to find Frozen Head State Park, instead of Fall Creek Falls, that day, but they were unsuccessful. Ms. Heflin believed they were in Wartburg when they started back towards Dayton and encountered the loose dog. According to Ms. Heflin in her statement, the victim started talking about the way Ms. Heflin was dressed and called her a prostitute before he tried to grab her arm; the victim continued to call her a hooker and threatened to treat her like one; and she ran back to the truck where, once inside, she told the Defendant what had happened. Ms. Heflin told Detective Owenby that the Defendant got out of the truck and asked the victim what he had said to Ms. Heflin, but Ms. Heflin claimed that she did not see what transpired after that because she was tending to her children who were upset. When the Defendant returned to the truck, they tried to find the state park again. During the interview, Ms. Heflin never mentioned the victim's touching her or the Defendant's possessing a baseball bat. Detective Owenby said that he did not threaten Ms. Heflin or withhold her children from her in order to secure her statement. According to Detective

-17-

Owenby, the children sat on the couch in the sheriff's department, and Ms. Heflin knew where they were when she gave her statement.

## C. *Verdict, Sentencing, and Appeal*

Following the conclusion of the proof, the jury found the Defendant guilty of the lesser-included offense of voluntary manslaughter in Count 1 and guilty as charged of aggravated assault in Count 2. Thereafter, the trial court sentenced the Defendant to four years and six months for the voluntary manslaughter conviction and five years and six months for the aggravated assault conviction. The two convictions were merged. The Defendant's timely motion for new trial was denied, and his appeal is now properly before this court.

## ANALYSIS

On appeal, the Defendant argues (1) that the trial court erred by denying his motion to suppress his statement because the stop of his vehicle was not supported by reasonable suspicion; (2) that the evidence was insufficient to support his voluntary manslaughter conviction, challenging the evidence establishing cause of death; (3) that admission of a photograph of the victim's injuries was more prejudicial than probative; and (4) that the State committed prosecutorial misconduct by referring to the amended death certificate which was testimonial in nature. We will address each in turn.

## I. *Motion to Suppress*

The Defendant argues that the baseball bat and his statement "must be suppressed because the initial seizure of [his] vehicle was unlawful and unsupported by reasonable suspicion." Specifically, he avers that, "under the totality of the circumstances and the absence of the arresting officer's testimony, there was insufficient information to justify the stop." Moreover, the Defendant asserts that the baseball bat and his statement "should be suppressed and excluded as fruits of the poisonous tree" stemming from the illegal stop. He continues that "the erroneous admission of the baseball bat" was not harmless and that the taint of illegality "was not sufficiently attenuated" to allow admission of the Defendant's statement. The State responds that the trial court properly denied the Defendant's motion to suppress because, "given Mr. Brewer's description of the [D]efendant, his companion, his truck, and his assault of [the victim], Detective Hall had reasonable suspicion to order another officer to stop the [D]efendnat's truck." Because the stop was constitutionally reasonable, according to the State, the fruit of the poisonous tree doctrine is inapplicable.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as

all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. (citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)). In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. A vehicle stop and detention of the vehicle's occupants constitutes a seizure under both constitutions. Whren v. United States, 517 U.S. 806, 809-10 (1996); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). In the context of a traffic stop, a person is seized when the officer activates the cruiser's blue lights. Binette, 33 S.W.3d at 218. Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 630 (Tenn. 1997). The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search passes constitutional muster. State v. Harris, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

A warrant is not required for an investigatory stop "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997); see also Terry v. Ohio, 392 U.S. 1, 21 (1968); Binette, 33 S.W.3d at 218; Yeargan, 958 S.W.2d at 630. Reasonable suspicion is a lower standard of proof than probable cause, but must be more than the officer's "inchoate and unparticularized suspicion or hunch.'" State v. Hanning, 296 S.W.3d 44, 49 (Tenn. 2009) (quoting State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008)). Our supreme court has explained that reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." Binette, 33 S.W.3d at 218. Reasonable suspicion exists when 'specific and articulable facts . . . taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Binette, 33 S.W.3d at 218 (quoting Terry, 392 U.S.

at 21). In order to determine whether an investigatory detention of a vehicle is supported by reasonable suspicion, this court must consider the totality of the circumstances, including the objective observations of the police officer, information obtained from other officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. Day, 263 S.W.3d at 903 (citing Alabama v. White, 496 U.S. 325, 330 (1990); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992)).

In addition, "[r]easonable suspicion 'is dependent upon both the content of information possessed by police and its degree of reliability.'" Day, 263 S.W.3d at 903 (quoting White, 496 U.S. at 330). "Information provided by a citizen/bystander witness known to the [police] is presumed to be reliable, and the prosecution is not required to establish either the credibility of the informant or the reliability of his information." State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993) (citing State v. Melson, 638 S.W.2d 342, 35455 (Tenn. 1982)); see also Day, 263 S.W.3d at 904 ("We acknowledge that information from a known citizen informant is presumed reliable and not subject to the same level of scrutiny applied to a compensated informant."). The rationale for applying the presumption of reliability in these circumstances is two-fold. State v. Dotson, 450 S.W.3d 1, 51 (Tenn. 2014). First, "[c]itizen informants, whether they be victims or witnesses, have necessarily gained their information through first-hand experience." State v. Luke, 995 S.W.2d 630, 636-37 (Tenn. Crim. App. 1998) (citing Melson, 638 S.W.2d at 354-56). Second, "[t]he criminal informant provides information in exchange for some consideration—whether it be monetary or the granting of some exemption or privilege—while the citizen informant acts in the interest of society or personal safety." Id. (citing State v. Smith, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993)); see also Day, 263 S.W.3d at 904 (citing Luke with approval). Thus, although Tennessee decisions have recognized the interests that typically motivate citizen informants and justify the presumption of reliability, no Tennessee decision has conditioned application of the presumption of reliability upon a showing that the citizen informant was in fact motivated by one or both of these interests. Dotson, 450 S.W.3d at 51-52. The presumption of reliability applies if the prosecution establishes simply that the information was provided by a known citizen informant. Id. at 52.

In this case, Detective Hall received information from Mr. Brewer, who was an eyewitness to the Defendant's assault of the victim, or stated another way, Mr. Brewer "necessarily gained [his] information through first-hand experience." See Luke, 995 S.W.2d at 636-37. Moreover, Mr. Brewer's identification of the Defendant, Ms. Helfin, and the pick-up truck, was motivated only by his interest in identifying the person who assaulted the victim. See id.

Detective Hall testified that, after the 9-1-1 call, he responded to the scene and spoke with Mr. Brewer, who stated that he had witnessed a man attack the victim with a

-20-

stick. Mr. Brewer described the assailant as a white man around thirty years of age and said that man was accompanied by a woman in a black dress and was driving a small, red pick-up truck with a two-toned paint job. According to Mr. Brewer, the front of the pick-up truck was shiny while the rear appeared to be painted with primer. Mr. Brewer further relayed that the pick-up truck left the victim's house about thirty to forty minutes earlier and was heading north on Highway 27. As Detective Hall was headed north on Highway 27, he observed a two-toned red truck heading south. Detective Hall radioed to Sergeant King, who was patrolling just to the south, and instructed him to stop the suspect vehicle. This information is sufficient to satisfy a "reasonable suspicion" that an occupant of the pick-up truck had just committed a criminal offense, which justified Sergeant King's seizure and brief investigatory stop of the Defendant and Ms. Heflin.

The Defendant notes that Sergeant King initiated the stop and then avers that, without Sergeant King's testimony, "it is unknown what specific and articulable facts he relied on in stopping the [Defendant's] vehicle."[3] However, the citizen complainant need not communicate directly with the officer conducting the investigatory stop. State v. Christian Philip Van Camp, No. E2014-00667-CCA-R3-CD, 2014 WL 7399671, at *4 (Tenn. Crim. App. Dec. 29, 2104). This court has held that, when, as in this case, an officer initiates an investigatory stop of a vehicle based not on the manner of driving but on information relayed from a dispatcher, the stop will be upheld "as long as the individual or agency placing the dispatch has the requisite reasonable suspicion supported by specific and articulable facts that indicate criminal conduct." State v. Moore, 775 S.W.2d 372, 378 (Tenn. Crim. App. 1989). The Moore court reasoned that the State, at the suppression hearing, may present "the testimony of the individuals who witnessed the information that is eventually passed on to the investigating officer" and that it was not necessary to have the police dispatcher testify, since he or she "simply served as a conduit in relaying the information" to the investigating officer. Moore, 775 S.W.2d at 378.

Further,

[b]ecause the doctrine of collective knowledge applies when determining whether an arresting officer has probable cause to arrest a particular suspect, it is logical that this doctrine also applies when determining whether an officer possessed reasonable suspicion to stop an individual. This idea of imputed knowledge has been applied by this court in the past.

---

[3] We note that, during the suppression hearing, the prosecutor stated Sergeant King was present in the courthouse, although the prosecutor did not know if Sergeant King's testimony was "going to change anything" because it was "pretty much cut and dried." Sergeant King did not testify.

State v. Robert Lamar Kelley, No. M2016-01425-CCA-R3-CD, 2017 WL 3721688, at *10 (Tenn. Crim. App. Aug. 28, 2017) (citing State v. Bryant, 678 S.W.2d 480, 482-83 (Tenn. Crim. App. 1984) (concluding that the initial detention of the defendant by an officer who heard another officer's description of the defendant's vehicle and request for assistance over the police radio was lawful even though the officer who stopped the defendant had not witnessed any unlawful activity by the defendant)), perm. app. denied (Tenn. Dec. 6, 2017). Under the concept of collective knowledge, all of the information known to Detective Hall would be imputed to Sergeant King at the time of the stop, so long as a sufficient nexus of communication existed. Because Detective Hall had reasonable suspicion that the Defendant was involved in the victim's assault and then directed Sergeant King to act by stopping the Defendant, a sufficient nexus existed such that Detective Hall's reasonable suspicion was imputed to Sergeant King. See id. (holding that, where a detective had reasonable suspicion that the defendant possessed marijuana and then directed another officer to act by stopping the defendant, a sufficient nexus existed such that the detective's reasonable suspicion was imputed to the officer conducting the stop).

The Defendant maintains that the trial court should have suppressed his statement and the baseball bat observed in the truck as "fruits of the poisonous tree." However, we have concluded that the stop was constitutionally reasonable being supported by reasonable suspicion. Accordingly, where there is no initial taint of unconstitutional police conduct, the "fruit of the poisonous tree" doctrine does not apply. See State v. Talley, 307 S.W.3d 723, 734 (Tenn. 2010).

Nonetheless, "[a]n investigatory traffic stop under Terry 'is a far more minimal intrusion [than an arrest pursuant to probable cause], simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.'" Binette, 33 S.W.3d at 218 (quoting Illinois v. Wardlow, 528 U.S. 119, 126 (2000)). In addition, "a reasonable traffic stop can become unreasonable and constitutionally invalid 'if the time, manner or scope of the investigation exceeds the proper parameters." State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001)). "[T]he proper inquiry is whether during the detention the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Id. However, "no hard-and-fast time limit exists beyond which a detention is automatically considered too long and, thereby unreasonable." State v. Justin Paul Bruce, No. E2004-02325-CCA-R3-CD, 2005 WL 2007215 at *7 (Tenn. Crim. App. Aug. 22, 2005); see also United States v. Sharpe, 470 U.S. 675, 685 (1985) ("if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop").

Much of the Defendant's secondary argument focuses on the officers' actions after they stopped the Defendant. For example, he avers that, "after being pulled over, he was immediately removed from the vehicle, interrogated [without Miranda warnings], placed in handcuffs, and finally placed in the back of a patrol vehicle to be taken to the sheriff's department." However, this court has held that, "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Harris, 280 S.W.3d 832, 840 (Tenn. Crim. App. 2008) (quoting State v. Gonzalo Garcia, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *21 (Tenn. Crim. App. Feb. 20, 2002), overruled on other grounds by State v. Garcia, 123 S.W.3d 335 (Tenn. 2003)). After stopping the suspect vehicle, Sergeant King radioed to Detective Hall that the truck's occupants matched the description provided by Mr. Brewer. Detective Hall arrived within minutes, and the officers inquired about Ms. Heflin's and the Defendant's travel plans and their activities that day. Ms. Heflin confirmed to Detective Hall that she and the Defendant were involved in the incident earlier that day at the victim's house. Ms. Heflin relayed to Detective Hall that the Defendant had struck the victim with a baseball bat, and Detective Hall testified that he observed a bat inside the pick-up truck in plain view. The trial court accredited Detective Hall's testimony. These facts were sufficient to establish probable cause to detain the Defendant further. See Henning, 975 S.W.2d at 294 (Tenn. 1998) (defining probable cause as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act").

In addition, Detective Hall testified that the Defendant willingly agreed to go to the police station, where he gave a statement after signing a Miranda waiver. Because the seizure was lawful, we likewise reject the Defendant's argument that the taint of the prior illegality was not sufficiently attenuated making his statement at the police station inadmissible. The Defendant further submits that, once at the station, "[h]e felt compelled to give a statement or otherwise he would be stuck there all day" and that he was not allowed time to review his statement before he signed it. The Defendant also notes that his statement was not electronically recorded and states that "it is unknown" whether he was properly Mirandaized. He makes these arguments in the section discussing whether his statement was sufficiently attenuated from the prior illegality. To the extent this can be construed as an attack challenging the voluntariness of the Defendant's statement, the issue is waived due to the Defendant's failure to cite to authorities, make appropriate references to the record, or provide an argument on the issue. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

II. *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the convicting evidence supporting his voluntary manslaughter conviction, arguing that the State failed "to prove the element of cause in fact" or, stated another way, that the Defendant caused the victim's death. In support of this argument, the Defendant notes that "no autopsy was performed," that "Dr. Seo's death certificate states the victim's cause of death was due to natural causes," and that "Dr. Mileusnic-Polchan['s] opinion regarding the cause of death [was] mere conjecture and speculation." The State counters that the evidence was sufficient to support the Defendant's voluntary manslaughter conviction.[4]

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Causation is an essential element of every homicide offense. State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001). Generally, this is established by showing that the victim's death was the natural and probable result of the defendant's unlawful conduct.

---

[4] The State correctly notes that the Defendant does not address the sufficiency of the evidence supporting his aggravated assault (by causing serious bodily injury) conviction in his appellate brief. Although the voluntary manslaughter conviction was merged into the aggravated assault conviction, the Defendant is not precluded from challenging the sufficiency of the evidence of the merged conviction. See State v. Jose Lemanuel Hall, Jr., No. M2013-02090-CCA-R3-CD, 2014 WL 4384318, at *12 (Tenn. Crim. App. Sept. 5, 2014).

State v. Richardson, 995 S.W.2d 119, 125 (Tenn. Crim. App. 1998) (citing State v. Barnes, 703 S.W.2d 611, 614-15 (Tenn. 1985)). The defendant's unlawful act or omission need not be the sole or immediate cause of the victim's death. Farner, 66 S.W.3d at 203 (citing Letner v. State, 299 S.W. 1049, 1051 (Tenn. 1927)). "It is only necessary that the defendant unlawfully contributed to the death of the deceased." Richardson, 995 S.W.2d at 125 (citing State v. Roberson, 644 S.W.2d 696, 698 (Tenn. Crim. App. 1982)).

More often than not, a homicide's causation is not seriously disputed, as little difficulty arises in proving the necessary causal connection between conduct and result. Farner, 66 S.W.3d at 204. In the instant case, however, causation is seriously disputed. "[C]ausation in criminal cases generally is a question of fact for a properly instructed jury," and "a jury's determination of the causation issue will be reviewed under the familiar sufficiency of the evidence standard and will not be disturbed by an appellate court so long as the evidence is sufficient to support the jury's determination." Id.

The jury was properly instructed on causation. In accordance with Tennessee Pattern Jury Instruction 42.14, the jury in this case was instructed as follows:

> [B]efore the defendant can be convicted of any degree of homicide, the [S]tate must have proven beyond a reasonable doubt that the death of the deceased was proximately caused by the criminal conduct of the defendant. The proximate cause of death is that cause which, in natural and continuous sequence, unbroken by any independent intervening cause, produces the death and without which the death would not have occurred.

> The defendant's conduct need not be the sole or immediate cause of death. The acts of two or more persons may work concurrently to proximately cause the death, and in such a case, each of the participating acts is regarded as a proximate cause. It is not a defense that the negligent conduct of the deceased may also have been a proximate cause of the death.

> However, it is a defense to homicide if the proof shows that the death was caused by an independent intervening act of the deceased or another which the defendant, in the exercise of ordinary care, could not reasonably have anticipated as likely to happen. However, if, in the exercise of ordinary care, the defendant should reasonably have anticipated the intervening cause, that cause does not supersede the defendant's original conduct, and the defendant's conduct is considered the proximate cause of death. It is not necessary that the sequence of events or the particular injury be foreseeable. It is only necessary that the death fall

-25-

within the general field of danger which the defendant should have reasonably anticipated.

If some other circumstance caused the victim's death, unrelated to the defendant's actions, that would be a defense to homicide unless the circumstance was of the natural result of the defendant's act.

There is evidence in this case that the deceased required medical attention as a result of injuries that may have been unlawfully inflicted by the defendant, and that such treatment itself may have contributed to the death of the deceased. If you find this evidence to be true, then you must determine whether the medical treatment is of such a character as to relieve the defendant of the responsibility for the death. One who unlawfully and seriously injures another to the extent that medical attention is required bears the risk that improper treatment may result in the death of the injured person. If the defendant unlawfully and seriously injured the deceased, he is not relieved of responsibility unless the treatment was performed in a grossly negligent and unskillful manner and unless it was the sole cause of the death.

If you find that the defendant's acts, if any, did not unlawfully cause or contribute to the death of the deceased, or if you have a reasonable doubt as to this proposition, then you must find him not guilty.

A. <u>Autopsy and Disinterment</u>. The Defendant first submits that no autopsy was performed because Dr. Seo did not report the victim's death to the county medical examiner or sheriff as required by Tennessee Code Annotated section 38-7-108. According to the Defendant, "[i]f the death had been reported to one of the appropriate authorities, then the county medical examiner would [have] be[en] required to conduct an investigation regarding the circumstances of the death, including performing an autopsy." The Defendant surmises that, "without an autopsy and without the [victim's] previous medical history[,] it is impossible to prove beyond a reasonable doubt that [the Defendant] was the 'cause-in-fact' of the death of the [victim]."

The powers and duties of the county medical examiner are described in several sections of the Post-Mortem Examination Act in Tennessee Code Annotated, Title 38, Chapter 7. Tennessee Code Annotated section 38-7-108(a) requires that "[a]ny physician . . . having knowledge of the death of any person from violence or trauma of any type, suddenly when in apparent health, [or] . . . deaths in any suspicious/unusual/unnatural manner . . . shall immediately notify the county medical examiner or the district attorney general, the local police or the county sheriff, who in turn shall notify the county medical examiner." When the death is reported as provided in section 38-7-108, "it is the duty of

the county medical examiner . . . to immediately make an investigation of the circumstances of the death" and for the county medical examiner to record and process the findings. See Tenn. Code Ann. § 38-7-109(a). Under the latter section, the duty to investigate the circumstances of a death where a death is reported under suspicious, unusual, or unnatural circumstances passes to the county medical examiner and is ministerial in nature. Dunbar v. Strimas, 632 S. W. 2d 558 (Tenn. Ct. App. 1981). Any person who neglects or refuses to comply with section 38-7-108 commits a Class E felony. Tenn. Code Ann. § 38-7-113.

Moreover, under Tennessee Code Annotated section 38-7-106(a), "a county medical examiner may perform or order an autopsy" on the body of any person in a case involving a homicide, a suspected homicide, a suicide, or a violent, unnatural or suspicious death. In the absence of a county medical examiner or if the county medical examiner fails to act, the district attorney general may order an autopsy in such cases. Tenn. Code Ann. 38-7-106(a). However, section 38-7-106 is discretionary, not mandatory. Workman v. Levy, 136 F. Supp. 2d 899, 900 (M.D. Tenn. 2001).

While it is true that a death under the circumstances outlined in section 38-7-108 must be reported, the statute only requires the county medical examiner to investigate the circumstances of the death and make a report, but it does not require an autopsy. Performance of an autopsy is discretionary and is not a prerequisite for a criminal conviction. Regardless of these statutory principles, Dr. Seo's compliance with section 38-7-108, or lack thereof, is not a yardstick for reasonable doubt.

The Defendant also comments that "the medical examiner, sheriff, and district attorney never requested or attempted to exhume the body of the deceased." Tennessee Code Annotated section 38-7-107 deals with the disinterment of bodies by the district attorney general. That statute currently provides, in relevant part, as follows:

(a)(1) When a person's death occurs under any of the circumstances set out in this part, any of the following persons may request the district attorney general in the district where the body is buried or interred to petition the appropriate circuit or criminal court judge in the district where a body is buried or interred to order a body disinterred:

(A) A state or county medical examiner;

(B) The district attorney general of the district in which it is claimed the death occurred;

(C) The district attorney general of the district in which an act causing the death occurred; or

-27-

(D) The district attorney general of the district in which the body is buried or interred, in the general's own discretion.

(2) The grounds for disinterment under this subsection (a) are:

(A) The person's death occurred under one (1) of the circumstances set out in this part;

(B) The person was buried or interred before an autopsy could be performed; or

(C) The disinterment will substantially assist in the collection of evidence for a pending criminal investigation, regardless of whether an autopsy was previously performed, or DNA, scientific, or forensic evidence was collected.

(3) The petition shall specify whether the district attorney general is requesting disinterment for the performance of an autopsy, to collect scientific or forensic evidence, to collect a DNA specimen from the deceased, or any combination of the three (3).

. . . .

(b) Upon the presentation of the petition to the judge, the judge shall be authorized to consider the petition and in the exercise of sound judicial discretion, either make or deny an order authorizing the disinterment and an autopsy to be performed upon the body of the deceased. The cost of disinterment and autopsy shall be paid by the state as provided in § 38-1-104.

The obvious purpose of this statute "seems to be to facilitate" the district attorney general "in the performance of [his or her] duty, when [he or she] deems such an order to be necessary, by providing expressly that [he or she] may file [a] petition [for disinterment] and if same be granted, the costs shall be paid by" the State. See Dennis v. State, 279 S.W.2d 512, 516 (Tenn. 1955) (concluding same under a prior version of the statute).

However, section 38-7-107 does not attempt to cover the entire subject matter governing disinterment and does not limit the authority of the court, or vest in the district attorney general alone, exclusive authority to make the application for disinterment. Dennis, 279 S.W.2d at 515-16. The court, upon application of either the State or a defendant, "has always had the discretion and power to order an exhumation and autopsy

-28-

where the necessity for same sufficiently is made to appear." Id. at 515. Stated another way, exhumation by the trial court is discretionary and requires a showing of necessity.

Dr. Mileusnic-Polchan noted that "exhumations are actually very expensive" and "very time consuming" and averred that "the results are not necessarily always the best." Dr. King agreed that an autopsy was more difficult on a body that had already been embalmed. Here, the Defendant had the ability to request exhumation of the victim's body but failed to do so. See State v. Jefferson, 529 S.W.2d 674, 690-91 (Tenn. 1975), overruled on other grounds by State v. Mitchell, 593 S.W.2d 280 (Tenn. 1980); Ricky Harris v. State, No. 03A01-9401-CV-00016, 1994 WL 399127, at *2-3 (Tenn. Ct. App. Aug. 3, 1994). Regardless, we conclude that the fact that body was not exhumed in order for an autopsy to be performed does not negate otherwise sufficient evidence supporting a criminal conviction. See, e.g., State v. Terry Lynn Craft, No. W2009-02049-CCA-R3-CD, 2010 WL 3365914, at *5-6 (Tenn. Crim. App. Aug. 26, 2010) (affirming the sufficiency of the evidence in a vehicular homicide by intoxication case where no autopsy was performed, and in doing so, rejecting the defendant's argument that it was "possible that something other than his conduct proximately caused the deaths of the victims" because "(1) [the victim] had prescription drugs in his system at the time of the crash; (2) [the victim] was not wearing his seat belt; (3) hospital employees might have negligently killed [the victims]; (4) the victims' Explorer might have had an undetected defect; (5) [the] 9-1-1 call and later interview were inconsistent in some ways").

We note that our supreme court has stated that, "until the autopsy is performed, law enforcement cannot know with certainty the cause or manner of death." State v. Hutchinson, 482 S.W.3d 893, 913 (Tenn. 2016) (citing People v. Leach, 980 N.E.2d 570, 5921-92 (Ill. 2012) (noting that the cause of death determined by medical examiner could have "either incriminated or exonerated [the suspect], depending on what the body revealed about the cause of death")). However, in Hutchinson, the victim suffered a sudden, violent death, and this comment was not made in discussing the sufficiency of the evidence. See id. (making the comment in determining whether an autopsy report was testimonial in nature). Here, the victim received medical treatment for weeks before finally succumbing to his injuries. There was extensive medical testimony about the victim's injuries and the medical treatment that followed up until the time of the victim's death. Logically, if a murder conviction can be upheld without a body at all, an autopsy is likewise not a prerequisite to convict someone of murder. State v. Kenneth Patterson ("Pat") Bondurant and Hugh Peter ("Pete") Bondurant, No. 01C01-9501-CC-00023, 1996 WL 275021, at *8 (Tenn. Crim. App. May 24, 1996) (holding that "[t]he failure to recover a victim's body should not be fatal to the prosecution of a homicide" because "[r]equiring a body would afford absolute immunity to defendants who are cunning enough to destroy the body or otherwise conceal its identity"); see also State v. Reggie Carnell James, No. W2007-00775-CCA-R3-CD, 2009 WL 636726, at *7 (Tenn. Crim.

App. Mar. 10, 2009) (concluding that, "despite the fact that the victim's body was not recovered, the evidence produced at trial was sufficient to establish the elements of first degree premeditated murder beyond a reasonable doubt"). Accordingly, we do not read Hutchinson as requiring an autopsy in every case; however, an autopsy is certainly advisable particularly in cases where the cause of death is challenged.

B. Death Certificates. The Defendant remarks that Dr. Seo's death certificate established prima facie evidence that the victim died of natural causes due to aspiration pneumonia. According to the Defendant, the State was required "to rebut[] the presumption" of the cause of death stated in the certificate but was unsuccessful in doing so. The Defendant also notes that Rhea County Medical Examiner Dr. Casady "drafted a delayed report diagnosis of death adding 'assault causing skull fractures.'" However, the Defendant submits that, because Dr. Casady did not testify at trial and the delayed report was not introduced as an exhibit, the "only physical evidence provided to the jury certifying the cause and manner of death was" Dr. Seo's certificate.

Under Tennessee Code Annotated section 68-3-202(c), a death certificate is prima facie evidence of the facts stated" therein. "Prima facie" evidence is "'[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.'" State v. Clark, 452 S.W.3d 268, 280 (Tenn. 2014) (quoting Black's Law Dictionary 638-39 (9th ed. 2009)). In addition, our supreme court has held that a death certificate "only raises a bare rebuttable presumption which becomes *functus officio* when met by contrary evidence[.]" See Boles v. Aluminum Co. of America, 483 S.W.2d 582, 583 (Tenn. 1972) (citing Milstead v. Kaylor, 212 S.W.2d 610, 614 (Tenn. 1948)).

Dr. Seo opined that, although he was responsible for preparing the death certificate, it did not reflect the chain of causality that led to the victim's death but reflected only the immediate cause of death. According to Dr. Seo, while the immediate cause of the victim's death was malnutrition and dehydration from aspiration pneumonia, the original blunt force trauma to the victim's head was the ultimate cause of the victim's death. Moreover, Dr. Mileusnic-Polchan, who was trained in forensic pathology, explained that many doctors do not receive adequate training in filling out death certificates, and she asserted that she would have handled the case differently. Dr. Mileusnic-Polchan likewise testified that head trauma was the ultimate cause of the victim's death and that she would have classified the victim's death as a homicide.

Additionally, the Vital Records Act of 1977 provides that a certificate "may be amended only in accordance with this chapter and regulations adopted by the department." Tenn. Code Ann. § 68-3-203(a). "The date of amendment and a summary description of the evidence submitted in support of the amendment shall be endorsed on or made a part of the record." Tenn. Code Ann. § 68-3-203(b). The Department of

Health's regulations establish that all amendments to vital records, other than minor errors, shall be supported by

> 1. an affidavit signed by one of the persons defined in 1200-07-01-.10(3) setting forth the information to identify the certificate, the incorrect data as it is listed on the certificate, and the correct data as it should appear; and 2. one or more items of documentary evidence which support the alleged facts and which were created at least five years prior to the date of the application for amendment or within seven years of the date of the event, i.e., birth, death, marriage or divorce related to the record.

Tenn. Dep't of Health, Comp. R. & Regs. 1200-07-01-.10(2)(a), "Amendment of Vital Records." Furthermore, Regulation 1200-07-01-.10(3) provides that "[a]pplications to amend the date of death or the medical certification of cause of death shall be made by the physician who signed the medical certification or the medical examiner." Accordingly, Dr. Casady had the authority to amend the death certificate. Regardless, Dr. Casady did not testify at trial, and the amended death certificate notwithstanding, we agree with the State that it rebutted any presumption created by Dr. Seo's death certificate.

C. Dr. Mileusnic-Polchan's Opinion. The Defendant maintains that Dr. Mileusnic-Polchan's "opinion regarding the cause of death [was] mere conjecture and speculation." According to the Defendant, Dr. Mileusnic-Polchan's opinion was "speculative because she ha[d] insufficient information" upon which to base her knowledge "without an autopsy or any medical proof of [the victim's] health prior to the injury[.]" The Defendant notes that the victim suffered from a "number of questionable illnesses and conditions" and that no toxicology report was performed.

Although an autopsy is not required, the State must still prove the corpus delicti beyond a reasonable doubt. State v. Shepherd, 902 S.W.2d 895, 901 (Tenn. 1995). Corpus delicti, meaning literally "the body of the crime," consists of two elements: (1) the death of a human being; and (2) a criminal agency in producing that death. State v. Driver, 634 S.W.2d 601 (Tenn. Crim. App. 1981); see also State v. Ellis, 89 S.W.3d 584, 600 (Tenn. Crim. App. 2000). In establishing the corpus delicti, the State may proffer testimony of an eyewitness to the act or rely purely on circumstantial evidence. Berry v. State, 523 S.W.2d 371, 373 (Tenn. Crim. App. 1974). Regardless of the State's method, the evidence must show that death or disappearance was not occasioned by accident, suicide, or natural causes. Shepherd, 902 S.W.2d at 901 (citing Davis v. State, 445 S.W.2d 933, 936 (Tenn. Crim. App. 1969)). "Whether the [S]tate has sufficiently established the corpus delicti is primarily a jury question." State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). The corpus delicti was sufficiently established in this case.

According to Dr. Mejia, the victim suffered a traumatic brain injury as a result of the blow to the head, and the victim's injuries were critical when he arrived at the hospital on September 14, 2012. Dr. Mejia testified that, the victim's injuries were consistent with his being hit in the head with a baseball bat, and the injuries were the result of "a significant force." Because the victim developed a condition causing him to have difficulty swallowing, which could cause aspiration and pneumonia and eventually sepsis, Dr. Mejia placed a feeding tube in hopes of reducing the victim's risk of aspiration. Dr. Mejia stated that the victim did not have "any history of aspiration before the accident," and he was not malnourished upon admission. Furthermore, both Paul and Ms. Ferrell testified that the victim did not have any difficulty swallowing prior to the attack and described that he ate plentifully. Moreover, Paul, Mr. Brewer, and Ms. Ferrell described that the victim was able to communicate and was in overall good physical health prior to this incident.

The victim was released to the rehabilitation center two weeks after his admission to the hospital. Dr. Seo described that the victim's condition deteriorated quickly, and the victim died six and a half weeks after the original injury. According to Dr. Seo, the victim died from malnutrition and dehydration, "secondary to aspiration pneumonia[,] secondary to head trauma." Dr. Seo averred that the ultimate cause of the victim's death was blunt force trauma to the head rather than the immediate cause of death of aspiration pneumonia despite what he stated in the death certificate. In addition, Dr. Seo stated that the head trauma was an "obvious" contributor to the victim's death.

Dr. Mileusnic-Polchan testified that, based upon her review of the victim's medical history and her knowledge of the victim's "state of health" prior to the assault, "all the complications . . . recorded in the victim's medical records stem or come from the blunt force head trauma." Dr. Mileusnic-Polchan averred that "the complications" the victim suffered from were "pretty typical for . . . direct trauma to the brain in the left hemisphere." She asserted that the immediate cause of the victim's death, aspiration pneumonia, was a complication of the original head trauma. Dr. Mileusnic-Polchan opined to a reasonable degree of medical certainty that the victim's cause of death was "sequela result blunt force head trauma due to assault," and she maintained that was how she would have documented it in the death certificate. Dr. Mileusnic-Polchan classified the victim's death as a homicide.

The Defendant's own expert, Dr. King, did not deny that the head trauma was a possible cause of the victim's death but was reluctant to state that it was the only cause. Dr. King acknowledged that, "but for [the victim's] being struck in the head with a bat, he would not have been in the hospital with a feeding tube," and that being bedridden can lead to pneumonia and aspiration. While an autopsy may have been helpful, again, one is not required as a prerequisite for a criminal conviction. We agree with the State that the

-32-

Defendant is asking this court to reweigh the evidence and disregard the testimony presented by the State establishing that the victim's death was the direct result of the Defendant's striking the victim in the head with a baseball bat.

The State presented more than pure speculation. The jury as the trier of fact is responsible for weighing the evidence presented at trial, and this court may not usurp that role and place itself in the role of fact-finder. We hold that the evidence is legally sufficient to support a jury's finding that the Defendant's conduct proximately caused the victim's death. See, e.g., State v. Thomas, 158 S.W.3d 361, 389 (Tenn. 2005) (appendix) (finding evidence of causation sufficient where both medical examiners testified to the injuries sustained by the victim from an April 21, 1997 gunshot wound to the head and the impact of the gunshot upon the victim during the intervening period until the victim's death on October 2, 1999, from sepsis due to the rupture of his bladder); State v. Russell Lee Maze, No. M2004-02091-CCA-R3-CD, 2006 WL 1132083, at *15-17 (Tenn. Crim. App. Apr. 28, 2006) (concluding that the evidence—the five-week-old victim, who had been in the defendant's care, arrived at the hospital May 3, 1999, comatose with severe and life-threatening injuries; the defendant admitted to shaking his son, although he insisted that the shaking was not violent; the State's expert testified that abusive, inflicted head trauma was the only medically reasonable explanation for the victim's injuries; and the State elicited evidence of the infant's condition from when he was discharged from the hospital through the time of his death on October 25, 2000—was sufficient to support convictions for aggravated child abuse and felony murder despite testimony from the defense's expert witness attempting "to persuade the jury that the victim's death was attributable to fatal liver disease, brain damage from Hepatitis B vaccine, and/or deterioration in the victim's diaphragm").

## III. *Photograph of Victim's Injuries*

The Defendant submits that the "trial court erred by allowing the State to display gruesome photographs of [the victim's] head injury[,]" depicting "[the victim's] head with a gaping blood wound and blood." The Defendant also references a "video [that] was inherently prejudicial." In support of his argument that the photographs and video were improperly admitted, the Defendant cites to the following: (1) the "sole purpose" of admitting these photographs "was to inflame the jury"; (2) while the "pictures may corroborate that [the victim] had a head injury," that fact "was undisputed"; (3) the photographs "do not show the severity of injury," and "the medical records were sufficient to demonstrate the extent of the injury"; the photographs "in no way help disprove [that the Defendant] acted in defense of a third person"; and "the photographs do not prove the cause or manner of death."

The State initially argues that the issue is waived because the Defendant did not file a pre-trial motion to exclude the photograph and failed to make a contemporaneous

objection to the admission of the photograph at trial. Alternatively, addressing the issue, the State responds that the trial court did not abuse its discretion in admitting "a single photograph" of the victim's injuries that was "not gruesome, inflammatory, or otherwise unfairly prejudicial." The State asserts that the photograph "was highly probative of the nature of the injury" because the Defendant "focused his defense on the premise that [the victim's] death was not the result of the blow to the head inflicted by the [D]efendant" and, thus, "the severity of the wound was at issue[.]"

First, we must address the State's allegation of waiver. After the State filed its appellate brief, the Defendant supplemented the record with a January 22, 2016 motion titled "Motion in Limine to Exclude Photographs and Video of Decedent's Injuries." The Defendant sought to exclude these items as irrelevant and, even if relevant, the items were "gruesome in nature" and would "serve no other purpose but to inflame the jury." Neither a transcript of a hearing on this motion nor an order by the trial court adjudicating said motion is present in the appellate record. Moreover, the State correctly notes that only a single photograph of the victim's injuries was admitted into evidence at trial. In addition, there is no mention of a video recording during the trial.

At trial, the photograph was first admitted upon redirect examination of Mr. Brewer. Prior to showing Mr. Brewer the photograph, defense counsel said, "Same objection as before, Your Honor[,]" to which the trial court responded, "Okay, we've ruled on that." The prosecutor then asked Mr. Brewer, "Show you a photograph and ask if you recognize what's in that photograph?" Mr. Brewer answered affirmatively and confirmed that the photograph depicted "the way [the victim] looked after he was hit[.]" The photograph was then introduced as an exhibit. Ms. Ferrell was likewise shown the photograph and agreed that it illustrated her depiction of the victim's injuries, "like his eye was coming out[.]"

In addition, Dr. Mejia was asked about the photograph on direct examination. The prosecutor showed Dr. Mejia the photograph and asked him to explain why "the laceration [was] over the [the victim's] left eye . . . but the right eye [was] completely black and swollen shut." Dr. Mejia said, "[T]hat's a sign of basic, basic skull fracture. Fractures to the base of the skull, patients are going to develop those raccoon eyes, and they're going to develop also vital signs, which are blood pooling behind the eyes. He did have a basic skill fracture. His ethmoid bone was fractured and that will cause a pooling of the blood around the eyes[.]"

Dr. Mileusnic-Polchan was also shown the photograph and asked if the injuries in the picture were "consistent with the injuries that [she] reviewed in the medical chart." She answered affirmatively, explaining that there was "a large stellate laceration" on the victim's left forehead, that the skull was fractured underneath the laceration, and that the skull fracture caused the victim's "raccoon eyes[.]"

During the Defendant's proof, Dr. King confirmed that he had seen the photograph and agreed that the victim's injuries reflected therein were consistent with being struck in the head with a baseball bat. When Ms. Heflin testified that the victim was "fine" after being hit, the prosecutor showed her the photograph and asked, "You thought that man was fine?" Ms. Heflin responded, "When I got back in the truck hysterical, because he had just told me what he was going to do to me, I assumed he was fine."

Accordingly, while it appears that defense counsel did lodge a contemporaneous objection to admission of the photograph at trial, the basis for the trial court's ruling is not apparent from the record before this court. The trial court's statement, "Okay, we've ruled on that[,]" indicates that a prior discussion had taken place; however, we have no transcript of that colloquy. A party seeking appellate review has a duty "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Failure to prepare a complete record precludes appellate review. See id. Consequently, the State is correct that this issue is reviewable only for plain error.

The plain error doctrine states that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this [c]ourt will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

"Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). Accordingly, the admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v.

<u>Banks</u>, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; <u>State v. Braden</u>, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

A relevant photograph is generally admissible under Tennessee Rule of Evidence 402, unless its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." <u>Banks</u>, 564 S.W.2d at 951. In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. <u>State v. Williamson</u>, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

Here, the Defendant was charged with second degree murder and aggravated assault. While the picture is unpleasant as it depicts the victim's face deformed by his injuries, we do not find that the picture is so gruesome as to have unduly inflamed the members of the jury. Both the significance of the injury and the force used by the Defendant were relevant to establish the Defendant's intent, as well as to rebut the Defendant's claim of defense of a third person and that he did not aim at the victim but merely swung to free Ms. Heflin. <u>See</u> <u>State v. William Valentine</u>, No. E2014-00522-CCA–R3-CD, 2015 WL 12978634, at *10 (Tenn. Crim. App. Apr. 9, 2015) (holding that photographs of the victim's scars were relevant to establish the defendant's premeditation and intent, as well as to rebut the defendant's claims that he shot the victim in self-defense, that he did not aim at the victim, and was shooting haphazardly at the car). Moreover, the Defendant forcefully disputed the victim's cause of death at trial; thus, the severity of the wound was at issue. Additionally, the State was required to prove that the Defendant suffered serious bodily injury in order to satisfy its burden for the aggravated assault conviction. <u>Id.</u> (citing Tenn. Code Ann. §§ 39-13-101, -102). For all of these reasons, we conclude that the trial court did not err in admitting the photograph of the victim's injuries. Therefore, no clear and unequivocal rule of law was breached, and the Defendant is not entitled to plain error relief.

IV. *Prosecutorial Misconduct*

As his final issue, the Defendant submits that "the State committed prosecutorial misconduct by alluding to the amended death certificate" during cross-examination of Dr. King. The Defendant affirms that "[t]he trial court had previously excluded the delayed

diagnosis report drafted by Dr. Casady," but he acknowledges that "[a] written order was never filed and a transcript of the hearing is not a part of the record." Nonetheless, the Defendant maintains that the amended death certificate was testimonial in nature and that "[t]he State never intended to call Dr. Casady at trial." According to the Defendant, the prosecutor, on cross-examination of Dr. King, "went too far knowing that [the] Defendant had previously objected and filed pleadings regarding the introduction of the amended death certificate."

The State again argues that the issue is waived due to the lack of a complete record. Alternatively, addressing the issue, the State counters that "Dr. King's comments had the potential to mislead the jury and give the impression that Dr. Casady essentially concurred in Dr. King's opinion[,]" and thus, "at the very least the [D]efendant opened the door to questioning about what Dr. King knew about Dr. Casady's involvement in the case." In addition, the State notes that it never sought to enter the amended death certificate into evidence and that the Defendant has not cited "a single authority establishing" that cross-examining a witness about a document "to which the witness has opened the door" is prosecutorial misconduct.

At trial, the prosecutor first referenced the amended death certificate during the direct testimony of Dr. Mileusnic-Polchan when he asked, "And Doctor, let me show you another document, one that was done later by Dr. Casady, and I believe she had the— what does she have as the . . . ." Defense counsel then lodged an objection, stating that the document was testimonial and that the court had already excluded the document. However, the prosecutor had no recollection of such a ruling. The trial court asked defense counsel, "When did I exclude it?" and defense counsel averred "last week." The State then withdrew its intention to admit the amended death certificate at that time. Although defense counsel maintained that "[t]he damage ha[d] been done," the trial court disagreed, saying that "no damage [had] been done" because "[t]he jury ha[d] not seen the document."

Dr. King opined on direct examination that he could not say to "a reasonable degree of medical certainty" that the head trauma caused the victim's death. Dr. King affirmed that his opinion was at odds with Dr. Mileusnic-Polchan's. Dr. King testified that he had spoken with both Dr. Mileusnic-Polchan and Dr. Casady approximately two weeks prior to trial. According to Dr. King, Dr. Casady told him that she did not "issue a report[] because she didn't see the body [and] she didn't investigate," and Dr. Mileusnic-Polchan said to him "she wouldn't feel comfortable saying what the cause of death" was in this case without an autopsy.

During cross-examination, Dr. King acknowledged Dr. Seo's trial testimony that, in addition to Dr. Seo's listing "pneumonia and aspiration" as the cause of death, Dr. Seo would have further said "that basically [the victim] died because of the blunt force trauma

that led to those conditions[.]" Dr. King then noted that Dr. Seo "disagree[d] with himself," that Dr. Seo "didn't write [that] on the death certificate," that Dr. Seo "didn't make any effort to have that documented," and that, if that was indeed Dr. Seo's opinion about the cause of death and the circumstances," then "he should have put it [on] there." The prosecutor then responded, "That's just a piece of paper. It does not change the facts of it. As a matter of fact, you talked to Dr. Casady and she did an amended one and submitted that where she did find it was [a] homicide, didn't she?" Dr. King said, "Yeah. That's a whole other problem." Defense counsel then objected, and a bench conference ensued.

Defense counsel stated, "You excluded that. He brought it up in connection against him, it's testimonial in nature and I don't have an opportunity to cross-examine Dr. Casady." The trial court replied, "[T]he discussion is just whether or not a piece of paper ought to be the final answer to the question," and "I think he has a right to probe [Dr. King] on that issue." Defense counsel again averred, "Judge, you excluded it last week," to which the trial court said, "I'm not sure why I excluded it." Thereafter, the prosecutor noted that he had no intention on introducing the document itself but merely wanted to question Dr. King about his conversation with Dr. Casady that Dr. King had alluded to on direct. The trial court then ruled, "I think if . . . he's going to say what he discussed with Dr. Casady then they can go further, so I deny your motion." The bench conference concluded, and Dr. King testified that regardless of what was written on either certificate it did not "change the facts of the case." Dr. King then described the procedure for filing an amended death certificate.

While the Defendant did supplement the record with a "Motion in Limine to Exclude Report of Delayed Diagnosis," the record still does not contain any reasoning by the trial court for excluding the amended death certificate. As noted by the Defendant, there is no transcript or order in the appellate record concerning this issue. Based upon the record before us, the trial court's reasoning for originally excluding the amended death certificate is not apparent from the record before this court. Moreover, the trial court did not recall ever ruling on the issue. Again, a party seeking appellate review has a duty "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal[,]" and failure to prepare a complete record precludes appellate review. See Ballard, 855 S.W.2d at 560. The State is once more correct that the issue is reviewable only for plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

-38-

On appeal, the Defendant focuses on the testimonial nature of the amended death certificate and does not cite to any case that cross-examining a witness about a document "to which the witness has opened the door" is prosecutorial misconduct. While the Defendant acknowledges the lack of a transcript or an order dealing with the issue, the Defendant makes no argument that we should review this issue for plain error. The Defendant cites to State v. James Michael Flinn, No. E2009-00849-CCA-R3-CD, 2013 WL 6237253, at *63 (Tenn. Crim. App. Dec. 3, 2013), abrogated on other grounds by State v. Jackson, 444 S.W.3d 554, 590 n.50 (Tenn. 2014), wherein this court held that a death certificate was testimonial in nature. The Flinn court reasoned, "A physician preparing a death certificate in a homicide case could reasonably conclude that the certificate would be available for use at a trial. . . . We note that although the record established that Dr. Blake was unavailable, there was no evidence of a prior opportunity for cross-examination." The Defendant also cites to Hutchinson, 482 S.W.3d at 906, as supporting his allegation that "[t]he primary purpose of Dr. Casady's amended death certificate was to prove past events for criminal prosecution and not to meet an ongoing emergency."

Despite the Defendant's argument, the trial court allowed the State to ask about the amended death certificate in response to Dr. King's answers on direct examination. Evidence that is not admissible may be admitted if the defendant "opens the door" by putting the issue into controversy. State v. Gomez, 367 S.W.3d 237, 246 (Tenn. 2012) (finding that "[e]ven if evidence is inadmissible, a party may 'open the door' to admission of that evidence."). A party commonly opens the door "by raising the subject of that evidence at trial." Id. Our supreme court has explained, "[w]hen a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." Id. (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039.1 (2d ed. 1987)).

Although raising a subject at trial is one manner of opening the door to otherwise inadmissible evidence, the concept of "opening the door" is "notoriously imprecise." State v. Gomez, 367 S.W.3d 237, 246 (Tenn. 2012) (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039)). In addition,

> [a]lthough the doctrine arises from the common law tradition of evidence, cf. Roger C. Park et al., Evidence Law § 1.11 (3d ed. 2011) (describing "curative admissibility" as a common law doctrine), our Rules of Evidence contain numerous examples by which otherwise inadmissible evidence may become admissible as a result of the action of a party in the case.

Id. For example, if evidence of prior bad acts of a defendant is inadmissible, the defendant may open the door to admission of that evidence by putting his character at issue. Id. (citing Tenn. R. Evid. 404(a)(1), (2); see also Tenn. R. Evid. 405(a)). A party

may also "open the door" to evidence of a witness's truthful character by attacking the reputation of a witness for truthfulness. Id. (citing Tenn. R. Evid. 608(a)). In short, "opening the door" is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence. Id.

In the context of otherwise inadmissible hearsay, this court has frequently utilized the "doctrine of curative admissibility" and concluded that the hearsay statements were properly admitted during redirect examination. State v. Land, 34 S.W.3d 516, 530 n.11 (Tenn. Crim. App. 2000) ("Although Tennessee has not expressly adopted the doctrine of curative admissibility, previous decisions of this court reflect an implicit adoption of the same.") (citing State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) (officer permitted to testify on redirect examination to previously excluded evidence because defense "opened the door" by eliciting on cross-examination the basis for the search of the defendant); Harrison v. State, 527 S.W.2d 745, 748 (Tenn. Crim. App. 1975) (defense called Chancery Court Clerk to testify regarding certain divorce matters between defendant and deceased, defense counsel did not introduce petition as exhibit, State permitted to cross-examine clerk on specific allegations in bill, since defense counsel had "opened the door"); State v. Raymond L. Covington, No. 01C01-9109-CC-00267, 1992 WL 99060 (Tenn. Crim. App. May 13, 1992) (defense counsel opened door by direct questioning of witness, prosecutor was entitled to rebut the appellant's insinuation by showing that the tape was not beneficial to either State or defense)). But cf. State v. Elliot Fullilove, No. W2009-01113-CCA-R3-CD, 2010 WL 4538122, at *5 (Tenn. Crim. App. Nov. 2, 2010) (declining to adopt the doctrine of curative admissibility). The Land court further observed that "[s]pecifically, in a criminal case, '[t]he rule operates to prevent an accused from successfully gaining exclusion of inadmissible prosecution evidence and then extracting selected pieces of this evidence for his own advantage, without the Government being able to place them in their proper context.'" 34 S.W.3d at 531 (quoting Lampkins v. United States, 515 A.2d 428, 431 (D.C. 1986)). The scope of the State's redirect examination, however, is limited to "[o]nly that evidence which is necessary to dispel the unfair prejudice resulting from the cross-examination." Id. at 531-532. In light of this jurisprudence, we cannot say that the trial court breached a clear and unequivocal rule of law by allowing the State to inquire about the contents of the amended death certificate.

In addition, the amended death certificate was never admitted as an exhibit at trial, and, therefore, we decline to delve into a lengthy discussion of whether the document itself is testimonial in nature. There was only a brief mention of the amended death certificate by Dr. King. Both Drs. Seo and Mileusnic-Polchan testified that the victim's cause of death was due to events occurring from the head trauma despite Dr. Seo's conclusion in the original death certificate. Dr. King challenged both Drs. Seo's and

Mileusnic-Polchan's conclusions, as well as Dr. Casady's in the amended death certificate.  We conclude that plain error relief is not necessary to do substantial justice.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE